10426.  INTERNATIONAL AGRICULTURAL CORPORATION *v.* SUBER.

1. Although the words "superintendent," "manager," and the like do not necessarily import that the employee bearing such title was the vice-principal of the master, such designation, coupled with other facts, was sufficient to raise a question for the jury as to whether he was, on the occasion in question, the vice-principal of the master.

2. An employer is liable if he so interferes with or assumes contral over work being done by an independent contractor as to create the relation of master and servant. Civil Code (1910), § 4415, subsection 5.

3. Moreover, under the provisions of the code-section cited, supra, the interference or assumption of control does not necessarily create the relation of master and servant, but it is sufficient to make the employer liable if it is such "that an injury results which is traceable to his interference."

4. Subsection 5 of section 4415 of the Civil Code, upon which the plaintiff's right of recovery is based, is entirely applicable to the particular facts of this case, and the numerous exceptions to the charge of the court are without substantial merit, since the charge, when considered as a whole, was free from reversible error.

DECIDED NOVEMBER 19, 1919.

Action for damages; from city court of Americus—Judge Harper. February 3, 1919.

J. F. Suber brought suit against the International Agriculture Corporation for injuries to his minor son. From the petition it appeared that the defendant corporation owned and operated a fertilizer plant near Americus, Georgia, and that it entered into a contract with Gammage, as an independent contractor. Under this contract, which was executed in behalf of the defendant corporation by R. L. Parker, its superintendent and manager in charge, Gammage agreed to paint the plant and furnish the necessary labor, tools, and supplies. The independent contractor employed the plaintiff's minor son as one of his workmen to help him paint the plant, and it is alleged that the minor was injured by the fall of the painter's swing, on which he was working. On the morning of the day when the injury occurred, the defendant's superintendent objected to the way the independent contractor had hung the swing or scaffold, declaring that it would materially injure the roof of the building if not changed, and directed that it be changed so as not to injure the roof. This objection was met by a statement from the contractor that he did not have sufficient rope to hang the swing as directed by the superintendent; whereupon the superintendent furnished the contractor with a grass rope, which, according to the plaintiff's petition, looked sound, but was in reality unsound, it having been affected by the acid fumes of the plant and very much weakened by such exposure. This rope, which held one end of the painter's swing, broke and caused the injury sued for. The suit is based on the idea that the defendant corporation, through its superintendent, so interfered with and assumed control over the affairs of the independent contractor as to create the relation of master and servant between the defendant and the petitioner's minor son, and that this interference and assumption of control was such that the injury complained of is traceable thereto. Liability was denied by the defendant on the ground that Gammage was an independent contractor, and that therefore the relation of master and servant did not exist between the defendant and the plaintiff's son, and also that it was not guilty of any actionable negligence in his injury. On the trial of the case the verdict was in favor of the plaintiff. The defendant's motion for a new trial was overruled, and it excepted.

The material parts of the evidence on the vital questions in the case are as follows: C. R. Gammage, the contractor, testified: "I was down here at the acid plant on the 2d of July, 1917. I traded for a job down there about two or three weeks before that date. The trade wasn't in writing whenever I traded for it. I signed a paper that morning when I went to work. I had that agreement with Mr. Roy Parker. Mr. Roy Parker is manager of the plant down there, superintendent. Under that agreement, what I undertook to do for him was paint that high work of that acid plant. The equipment I had for that purpose was a swinging stage. . . The usual way of fastening them to a building is we have hooks made and everybody uses hooks to put on top. I had hooks. That was attached to the building when we were using it in the ordinary and customary manner, hung over the top of the roof,—the hooks was. The north end of that building is about 82 feet high. When I went to hang the platform we started to hang it the usual way, I started to hang the hooks on the top of the building, and Mr. Parker says, 'No, you ain't going to do that, you will tear up the roof and will have my roof leaking.' He says,' Do it like you done it before.' I says, 'Mr. Parker, I haven't got a rope.' He says, 'I got plenty of rope, 300 or 3000 feet,'—I forget which he said. So I says, 'Give me a piece of rope.' He got me a piece about 4 feet long, and I told him that wasn't long enough; so he got a great long rope. I reckon it was 15 or 20 feet long. That rope was about one inch rope, may be an inch and a quarter. As to the appearance it had as to being perfectly safe, I didn't see anything wrong with it at all,— no, sir, no apparent defects in it at all; I couldn't see any. If that rope had been sound, its capacity to hold was—oh, it would have held anything that got on it, I reckon. It would have held up a dozen or more men. There was three of us on it. As to how he told me to fasten that, whether to attach it to the building, he told me to run it through the louver vent and hang my hooks in it. . . I fastened it as he told me to. Dude Slappy, Philmore Suber and Ike Hudson were helping me in that undertaking, they were working for me. Suber and Slappy and me were on that platform when it fell. The first time Mr. Parker spoke to me was when I told Slappy to bring me 4 or 5 boards. He told me that I wasn't going to hang those hooks on the roof, that I would tear up the roof,

I told him if I tore it up I would fix it. I didn't change my rigging or staging in any way, did not make any alterations in the rope or anything. I didn't change the rope at all, only had the new rope that Parker gave me. It was complete if I had hung the hooks on the roof, I wouldn't have needed any other rope. If the rope had been good it would have been safe."

J. I. Hudson testified: "On July 3, 1917, I was painting at the acid plant with C. R. Gammage. I was working for him. I was there when the stage was put in position. They were to swing it from the roof. They had hooks to hook over the roof. Mr. Parker objected to them putting the hooks on the roof. They didn't have rope to run through the louver, and Mr. Parker furnished them with a grass rope. Mr. Gammage told him it wouldn't hurt the roof, that that was the way it was painted before and was the way it ought to be painted that time. He told Mr. Parker that if he should leave a hole in the roof he would patch the roof, fix it back. Mr. Parker would not agree to it then. I saw the fall. The west end of that swinging platform gave way first, the rope broke and the stage fell. The grass rope that Mr. Parker furnished them broke. I know because I saw it."

The plaintiff's son who was injured testified: "When we started to hang the hooks on the roof Mr. Parker told Gammage not to hang the hooks on the roof. He didn't want them hung there because they would tear up the roof. In reply to that Mr. Gammage told him that he didn't have any other way to fix it, didn't have any rope or anything to fix it with. Mr. Parker said he would give him some ropes so he could hang it on the outside and not hang it on the roof. Mr. Parker went and got a rope and told Gammage to fix it, but not to hang it on the roof. Gammage tied it around the piece that goes up in the center of the building. Mr. Parker instructed him to do it that way. Mr. Parker said he could get some rope for him. Mr. Parker then went and got the rope. He got a grass rope. He got it over in one corner of the building. At the time I was down there and they were putting up this scaffolding to paint this building I didn't know of the effect of acid fumes, of acid on grass ropes and like substance,—what effect it would have."

R. L. Parker, the defendant's superintendent, testified: "I was manager of the International Agriculture Corporation plant in Americus, Ga., in July, 1917, and I am now. I entered into a

contract with Mr. C. R. Gammage for certain work there on that building during that year, and Mr. Gammage entered upon that work. . . I have been superintendent down there 7 years the first of next month. I manufacture acid phosphate in that building." T. J. Wallis testified: "I observed the effect that fumes from the acid plant and the floating particles from the handling of acid would have on grass ropes, sacks, and like substance. Wherever they come in contact with the fumes which come from the mixing it would go to pieces in little or no time. In the process of deterioration I don't think they would give any evidence of it to an unexperienced mind. These fumes affect anything anywhere in the building where the mixing is going on."

· *Little, Powell, Smith & Goldstein, Miller & Jones, Maynard & Williams,* for plaintiff in error.

*Shipp & Sheppard, Hixon & Pace,* contra.

SMITH, J. (After stating the foregoing facts.) The contention of plaintiff in error that the evidence adduced on the trial was insufficient to show that Parker, its superintendent and manager, was in fact its vice-principal or alter ego is without substantial merit. It will be recalled that Parker himself testified that he had been for seven years and was at the time of the trial the superintendent and general manager of the defendant's plant at Americus, Georgia, and that he, in behalf of the corporation, entered into a contract with the independent contractor to paint the building. The testimony of Gammage, the contractor, likewise shows that Parker had general supervision of the plant where the injury occurred, and in behalf of the corporation arranged for the painting of the building by the contractor. In this connection the record further shows that the plaintiff in his petition alleged that the defendant corporation, through its agent and superintendent, R. L. Parker, entered into a contract with C. R. Gammage, and the defendant in its answer says that "it owned and operated the acid or mixing plant referred to in the petition, and admits that it employed C. R. Gammage as an independent contractor to do some painting work on the said plant."

While it is true of course that the words "superintendent," "foreman," "overseer," and the like, do not necessarily import that the employee bearing such title was the vice-principal of the

29

master (*Moore* v. *Dublin Cotton Mills, 127 Ga.* 609, 56 S. E. 839, 10 L. R. A. (N. S.) 772), we do not hesitate to hold that the facts in the instant case were not only amply sufficient to show but demanded the conclusion that Parker was the vice-principal of the defendant corporation.

Plaintiff in error further contends that even if Parker was a vice-principal, the interference relied upon was not such as to create the relation of master and servant. This contention is without merit, since the facts in the case show that the defendant's vice-principal not only interfered with the manner in which the independent contractor and his employees were painting the building,—prohibiting them from hanging the hooks on the roof of the building,—but went further and directed where and how the hooks should be hung, furnishing them with a rope with which to hang the scaffold as directed by him; all of which was contrary to the usual manner which the contractor generally employed in doing such work, for, in the words of the only witness for the defendant, "the stage before [the contractor having previously painted the defendant's building] was hung from the top of the building, from the roof. The hooks were hung from the top of the building. I did not make an objection then, hanging of it from the roof." Also the witness Gammage testified that Parker not only interfered and restrained him from hanging the stage as he had started and desired to do, but directed how and where he should hang the hooks which supported the stage or scaffold. The vice-principal having interfered and assumed control to such an extent as to create the relation of master and servant, it was his duty to furnish the employees with a reasonably safe and sound rope. According to the evidence, he got the rope from a corner of the building where they had been mixing acid, and neither the independent contractor nor his employees knew anything of the effect of acid fumes on a grass rope, and they had no opportunity to examine the rope furnished them other than to casually observe it while hanging the scaffold. However, the vice-principal knew or should have known, after his seven years as manager of the acid plant, of the effects of acid fumes on a grass rope, and should have warned the employees of the latent defects thereof. Civil Code (1910), § 3130. See also *Huey* v. *Atlanta, 8 Ga. App.* 597 (3), 604 (70 S. E. 71).

Moreover, had the evidence been insufficient to show that the interference by the vice-principal was such as to create the relation of master and servant, the defendant in the case would nevertheless have been liable under the provisions of the Civil Code, § 4415, subsection 5. This subsection provides that "the employer is liable for the negligence of the contractor if the employer retains the right to direct or control the time and manner of executing the work; or interferes and assumes control, so as to create the relation of master and servant, *or so that an injury results which is traceable to his interference.*" Obviously, therefore, the interference and assumption of control need not necessarily create the relation of master and servant, but it is sufficient to make the employer liable if it is such "that an injury results which is traceable to his interference,"—the conjunction "or" being used in the code-section in a disjunctive rather than a conjunctive sense. See, in this connection, the case of *Johnson* v. *W. & A. R. Co.*, 4 *Ga. App.* 135 (60 S. E. 1025), where it is held: "For an owner to interfere and assume control, so that an injury results which is traceable to his interference, renders him liable, in this State, although, but for his interference, he might have been free from liability." The evidence in the case at bar clearly established that the injury for which damages are sought was traceable to the interference of the defendant's vice-principal, since he furnished the contractor with the defective rope which broke and precipitated the plaintiff's son to the ground.

We have only dealt with the main contentions of the plaintiff in error as they raise the vital questions in the case. However, after a careful examination and consideration of the record before us, we are satisfied that section 4415, subsection 5, supra, is entirely applicable to the particular facts of this case, and that the numerous exceptions to the charge of the court are without substantial merit, since the charge, when considered as a whole, was free from reversible error. Therefore the judgment of the lower court in overruling the motion for a new trial is

*Affirmed. Jenkins, P. J., and Stephens, J., concur.*