*Leonard Farkas, Walter H. Burt,* for plaintiff in error.
*Bennet & Peacock,* contra.

## 23690. GEORGIA POWER COMPANY *v.* GILLESPIE.

DECIDED SEPTEMBER 29, 1934.

*Colquitt, Parker, Troutman & Arkwright, Erwin, Erwin & Nix, George A. Johns,* for plaintiff in error.

*James H. & Emmett Skelton, Marshall Allison, Clifford Pratt, Hugh & Carey Skelton,* contra.

GUERRY, J. This was an action brought by Mrs. Nannie Gillespie in the superior court of Barrow county, seeking to recover damages for the death of her husband, Grady Gillespie, as a result of

the alleged negligence of the defendant. The trial resulted in a verdict and judgment in favor of the plaintiff. The defendant's motion for a new trial was overruled. To this ruling the defendant excepted.

It appears that during the early part of the fall of 1929, the Georgia Power Company entered into a contract with the Empire Construction Company whereby the Empire Construction Company agreed to rebuild the electric plant in Winder, Georgia, removing all old wires, poles, and cross-arms, and to erect a new system, putting up new poles, cross-arms, and new wires; that Grady Gillespie, the husband of Nannie Gillespie, was employed by the Empire Construction Company as a ground man or ground helper in the rebuilding of said electric system of the Georgia Power Company; that Grady Gillespie's duties were to help put up poles, wait upon the other employees, and keep all of the dead wires out of the streets; that he was not employed to climb poles or work on said poles, or to handle live wires, and had worked in this capacity for at least six months. During said construction work, the Georgia Power Company continued to carry on its business of furnishing electric power and service to its customers. It further appears that primary electric lines which contained 2300 volts had been reconstructed on Broad street in the direction of the town of Jefferson as far as New street. Before Gillespie was killed, a primary line ran off Broad street down New street about two blocks to a transformer, where the transformer reduced it to a secondary electric line, which carried 110 to 220 volts, and then went on down New street as a secondary line to a dead end. Gillespie was killed on New street between Broad street and said transformer by half insulated wires which were cut on one end, the cut end falling to the ground. On the afternoon of the 16th of October, 1929, about one o'clock in the afternoon, certain crews of the Empire Construction Company were at work on the wires of the Georgia Power Company on Broad street in the city of Winder, and "one of the linemen cut two secondary wires that connected with the primary wires on Broad street," and the said employee of the Empire Construction Company let the said wires which they cut fall in said Broad street while being heavily charged with an electric current. An agent of the Empire Construction Company (W. P. Cooley) told Grady Gillespie to move the wires which had been cut out of the street,

instructing him to tie them around a fire plug, and Grady Gillespie picked up said wires, one in each hand, and was instantly killed by the current of 2300 volts sent through said wires. The cutting of the wires would have stopped the electricity in them, and when they reached the ground 30 feet below they would have been dead and no harm would have been done the deceased but for the fact that the Empire Construction Company had, a short time before, constructed an electric line from Broad street down Wright street, parallel with New street, and had connected this line up with the transformer on New street beyond where Gillespie picked up the wires, thus letting the current flow into the wires from the opposite direction from which they were cut. The method of connecting the Wright street line with the Broad street line which caused the current to flow into the wires that killed the deceased was putting in two plugs and thus connecting the two lines. The employee of the construction company who cut the wires on New street and told Gillespie to remove said wires testified that if he had known the plugs had been put in on Wright street, he would have had them removed before proceeding with the cutting of the wires on New street.

The Empire Construction Company, it seems to us, was an independent contractor, and, if we do not misconstrue the brief of the defendant in error, her attorneys are also of this opinion. It further appeared that "the entire method and means of doing the work in and around Winder was under the complete supervision and control of the independent contractor, Empire Construction Company, and the Georgia Power Company did not exercise any supervision or jurisdiction at all in the construction or reconstruction of said system. There was not any supervision of the Georgia Power Company or any official of the Georgia Power Company or any force of the Georgia Power Company with reference to the construction or rebuilding, or building of the Winder lay-out of the line and service. The Empire Construction Company pursued its own methods." "The Georgia Power Company had nothing to do with the work or the carrying on of the work, or inspection of the work at the time it was being carried on by and under the independent contractor, the Empire Construction Company." "When the job was done it was the job of the Empire Construction Company. The Empire Construction Company adopted the method of doing

the job. The Empire Construction Company instructed the employees how the work should be done." "The evidence was further undisputed that in carrying on this work the Empire Construction Company could make any of the lines upon which it was working 'dead' wires, as it saw fit. This would be done by pulling certain plugs, and the jurisdiction over this work and the authority to pull those plugs was entirely under the control of the Empire Construction Company." "The evidence was that there was a safe way of working on wires carrying 2300 volts; that it was standard practice to work on and with live wires carrying 2300 volts, and that there was a safe way of doing and carrying on such work."

The plaintiff in his petition alleged: "32. That the Empire Construction Company, the contractor of defendant, was negligent in having petitioner's husband handle live and dangerous wires charged with 2300 volts of current. 33. That said Empire Construction Company was negligent in not notifying petitioner's husband that said wires were so charged with 2300 volts. 34. That said Empire Construction Company knew, or could have found out that said wires were so charged. 35. That said Empire Construction Company was negligent in not furnishing petitioner's husband with insulated gloves and equipment with which to handle live and deadly wires as it had him to handle on the date of his death. 36. That said Empire Construction Company was negligent in not having the current cut off before it had petitioner's husband move said wires from the street at the time he was killed. 37. That said Empire Construction Company was negligent in not advising petitioner's husband of the extreme danger of handling wire charged with 2300 volts of current; that said construction company knew that petitioner's husband knew nothing of the handling of live wires, and that he was only a green farmer who had never done work of that nature before he went to work with them." These paragraphs were afterwards stricken by amendment but were introduced in evidence by the defendant at the trial. The evidence further disclosed that the line which was cut would have been a dead line except for the fact that what had been a dead end had been connected with the line coming down Wright street, and that this connection was made by the employees of the Empire Construction Company on the morning of the day on which the plaintiff's husband was killed. This fact was not known by the lineman who cut the wire nor by the

deceased. It is also shown that the Georgia Power Company did not have notice that the Wright line was plugged and the power turned thereon on this occasion.

There is no difference of opinion among the members of this court as to the facts of this case as above stated. There is a wide difference of opinion as to the conclusion which is to be drawn from these facts. The general rule upon the subject of independent contractors has been stated by the Supreme Court as follows: "When an individual or corporation contracts with another individual or corporation exercising an independent employment, for the latter to do work not in itself unlawful or attended with danger to others, such work to be done according to the contractor's own method and not subject to the employer's control or orders except as to the result to be obtained, the employer is not liable for the wrong or negligent acts of the contractor or the contractor's servants." *Ridgeway* v. *Downing Co.,* 109 *Ga.* 551, 559 (34 S. E. 1028. Section 4415 of the Civil Code (1910), which prescribes exceptions to this rule, was codified from the opinion of the Supreme Court in the case of *Atlanta & Florida R. Co.* v. *Kimberly,* 87 *Ga.* 161 (13 S. E. 277, 27 Am. St. R. 231). That was a suit against a railroad company because of the ponding of water, in which the railroad company defended upon the ground, among others, that the work was done by an independent contractor and that the ponding of the water was an act for which they were not liable. In discussing that case the court said: "It was argued by the able counsel for the defendant in error that the building of a railroad necessarily results in a nuisance, unless certain precautions are taken to prevent it; that the low places by which the surrounding lands are drained and from which the water is carried off must be filled up, and unless certain precautions are taken to provide an escape for the water, a nuisance necessarily results; and that the railroad company can not escape liability by having the work done by an independent contractor. If the premises of counsel are true, the conclusion might also be true; but if a railroad is built properly, we do not think any nuisance will result from the building. The company, under its charter, had authority of law to do this work; and when it contracted with the construction company it was of course implied that the latter would do the work in a proper and lawful manner. 'A person employing another to do a

lawful act is presumed, in the absence of evidence to the contrary, to have employed him to do it in a lawful and reasonable manner; and therefore, unless the parties stand in the relation of master and servant, the employer is not responsible for damages occasioned by the negligent mode in which the work is done.' 1 Redfield Rwys., 6th ed. 542."

With regard to the case at bar, it is true that electricity is a dangerous force, and, unless properly and carefully handled, will necessarily result in injury either to person or property. It is also in evidence, however, that there is a safe and standard practice in the handling of electricity which if followed will not result in harm. It was necessarily implied in the contract between the Georgia Power Company and the Empire Construction Company that the latter would do this work in a proper and lawful manner. It had entire control over the cutting off of the current and of the putting on of the current. The construction of lines or the handling of lines not connected up was a safe and proper work. The cutting on and cutting off of the power was a matter entirely within the power and discretion of the independent contractor. In the case of Bower v. Peate, 1 Q. B. Div. 321, cited in the minority opinion, it will be noted that there was a failure on the part of the employer to direct that any proper retaining wall be constructed to prevent injury to the adjoining property, and that the independent contractor was merely carrying out the contract which had been let by the employer. In Thompson on Neg. (2d ed.), § 624, it is said: "If, under such a contract, the excavation for the building is so negligently done as to injure a structure on adjoining premises, the owner will not be liable provided the plans and specifications furnished to the contractor were sufficient to secure a safe construction of the building, and provided the erection of the building was not, in its nature, dangerous to adjacent property." If the owner of adjacent property merely hires an independent contractor to make excavations adjacent to the wall of his neighbor's building without providing in any way for safeguarding such walls, and such contractor carries out the directions of his employer, such employer will be liable for any injury resulting from the work carried out in the manner directed by him. On the other hand, if the plans and specifications provided that proper and necessary precautions be taken to prevent injury and such independent contractor failed to

obey such instructions, the employer would not be liable. Where the injury results directly from the acts which the contractor agrees to and is authorized to do, the person who employs the contractor is equally liable to the injured party. Robins *v.* Chicago, 4 Wall. (U. S.) 657 (18 L. ed. 427). "If the act or neglect which produces the injury is purely collateral to the work contracted to be done and entirely the result of the wrongful acts of the contractor and his workmen the proprietor is not liable." Palmer *v.* Lincoln, 5 Neb. 136 (25 Am. R. 470). In the construction of a tall office building the owner would not be liable for the failure of the independent contractor to erect safe scaffolding, although both he and the independent contractor knew that the failure so to do was necessarily dangerous to the employees working thereon. In 39 C. J. 1327, it is said: "The employer has a right to rely on the presumption that the contractor will discharge his legal duties owing to his employees and third persons." The case of Larson *v.* Metropolitan Street Ry. Co., 110 Mo. 234 (19 S. W. 416, 16 L. R. A. 330, 33 Am. St. R. 439), was a suit against the owner of a building for damages caused by the digging of a trench too long and deep alongside the wall of the plaintiff. It was said: "Now the very act complained of here is the digging of the ditch too long and too deep in the circumstances. That act is charged as negligence. It was ordered by the defendant's representative on the spot acting for the chief engineer who had express power to direct by his authorized agents as well as personally. The work was done precisely as ordered. Thus it was the exercise of the discretion or judgment vested in the supervising authorities which caused the catastrophe, and for that exercise of judgment the defendant must respond." Quoting again from Thompson on Neg. (2d ed., § 652): "The Supreme Court of Ohio have, in an official syllabus, stated the rule to be that one who caused work to be done is liable for the acts of employees of an independent contractor, where the resulting injury, instead of being collateral and flowing from the negligent act of the employee alone, is one that might have been anticipated as a direct or probable consequence of the performance of the work if reasonable care was omitted in the course of the performance."

We are unwilling to hold that electricity is a substance so inherently dangerous that a power company may not contract for the

building of power lines with an independent contractor and absolve itself from liability for an injury which occurs solely because of the negligence of such independent contractor in the doing of the work. In this case it is apparent that the power company had no direction or control over the joining up of another line with the supposed dead line on New street. It is apparent that the power company had no direction or control over the plugging in of the current that electrified this line which was being constructed by the independent contractor. It is apparent from the record that except for the negligent conduct of the independent contractor and its employees in doing this work, the injury would not have occurred. For this reason the evidence did not support the verdict and the court erred in overruling the motion for a new trial. In view of the ruling above made it does not become necessary to pass upon the other assignments of error.

*Judgment reversed. Sutton, J., concurs. MacIntyre, J., dissents.*

MacIntyre, J., dissenting. The general rule upon the subject of independent contractors has been stated by the Supreme Court as follows, "When an individual or corporation contracts with another individual or corporation exercising an independent employment, for the latter to do work not in itself unlawful or attended with danger to others, such work to be done according to the contractor's own method and not subject to the employer's control or orders except as to the result to be obtained, the employer is not liable for the wrong or negligent acts of the contractor or the contractor's servants." *Ridgeway* v. *Downing Co.,* 109 *Ga.* 551, 559 (supra). There are, however, exceptions to this rule, which are stated in the Code (1910), § 4415. This section is a codification of the principles enumerated in *Atlanta & Florida Railroad Co.* v. *Kimberly,* 87 *Ga.* 161 (supra). The second exception in this code section is that if according to previous knowledge and experience, the work to be done is in its nature dangerous to others, however carefully performed, the employer will be liable. In discussing this exception, the Supreme Court in the *Kimberly* case cited Bower *v.* Peate, 1 Q. B. Div. 321, and Pickard *v.* Smith, 10 C. B. 470. In the Bower case the facts were that "The plaintiff and defendant were owners and occupiers of two adjoining houses, and it appeared that, prior to the rebuilding of the defendant's house, as

hereinafter mentioned, the walls and foundations of the plaintiff's house went to a lower level than those of the defendant's. The defendant, having determined to pull down his old house and build another on the same site, proposed to carry the foundations and walls of his new house to a lower depth than those of the plaintiff; for which purpose it would be necessary to excavate and remove the soil which before the alteration was adjacent to the plaintiff's house and land, and by which it had been supported. In order to do this without injury to the plaintiff's house the well-known practice of underpinning, or some other safe mode of supporting or shoring the plaintiff's soil and walls during the operations, would, as was well known, have to be resorted to. . . After the execution of this contract Rae, the contractor, pulled down the defendant's house, and excavated the soil to a lower depth than the foundation of the walls of the plaintiff's house, and rebuilt the defendant's house. But owing to defective underpinning, or want of other support to the plaintiff's soil and walls, in the course of these operations, injuries occurred to the plaintiff's house which gave rise to the present action." And in the opinion the court said that "a man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise, unless means are adopted by which such consequences may be prevented, is bound to see to the doing of that which is necessary to prevent the mischief, and can not relieve himself of his responsibility by employing some one else—whether it be the contractor employed to do the work from which the danger arises or some independent person—to do what is necessary to prevent the act he has ordered to be done from becoming wrongful. There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted. While it may be just to hold the party authorizing the work in the former case exempt from liability for injury, resulting from negligence which he had no reason to anticipate, there is, on the other hand, good ground for holding him liable for injury caused by an act certain to be attended with injurious consequences if such consequences are not in fact prevented, no matter through whose default the omission to take the necessary measures for such prevention

may arise." "It is true, that according to the doctrine in Back-house *v.* Bonomi, [9 H. L. Cas. 509, s. c. 34 L. J. Q. B. 181], the removal of the soil, to the support of which an adjacent building or land may be entitled, is not in itself wrongful, and becomes so only when damage to the adjoining property results; whence it follows that if by artificial means of support the damage can be prevented, no cause of action arises. But it is equally clear that if effectual means of prevention fail to be applied, and damage once results, the act of removal becomes wrongful, and an action can be at once maintained." "In the present instance preventive measures adequate to the occasion having failed to be provided, the removal of the soil was followed by actual damage to the plaintiff's house, and the act of removal was therefore wrongful as causing a wrong done to the plaintiff. But the act of removal was an act done by the order and authority of the defendant—in other words, was the act of the defendant; and no man can get rid of liability for injury occasioned to another by a wrongful act by seeking to throw the responsibility on an agent whom he has employed to do the act. The agent may no doubt be responsible, but the responsibility of the principal is none the less."

In the instant case the power company handed over to the contractor the plant in Winder for the purpose of being rebuilt, yet continued to use it for supplying its customers with electricity. A part of the plant consisted of wires containing 2300 volts of electricity. It is common knowledge that such wires are among the most dangerous instruments in existence when they come in contact with a human being and are uninsulated. The work of the removal of these half-insulated wires is fatally dangerous so long as this amount of voltage is flowing through them and the contract seems to have anticipated that this current should flow through these wires until cut off in the sector where the work was being done. What was done to prevent the injury in this case? The attempted preventive measure was the cutting of the primary voltage wires on New street near Broad street. This would have stopped the flow of electricity before it reached the employees but for the fact that the independent contractor, through its other employees, had put in two plugs that caused the wires to be charged with 2300 volts of electricity flowing into them from the opposite direction. So, after all, the flow of electricity was not stopped or reduced.

The effectual means of prevention failed to be applied. Therefore the deceased, in handling these half-insulated wires, was certain to be injured. The injury of the deceased was caused by an act certain to be attended with injurious consequences if such consequences were not in fact prevented. The power company, which ordered work to be executed from which in the natural course of things injurious consequences to the employee must have been expected to arise, unless means were adopted by which the consequences might be prevented, was bound to see to the doing of that which was necessary to prevent the mischief. The instruction to remove the half-insulated wires carrying 2300 volts of electricity was so dangerous in its nature that injury would arise unless preventive measures were taken, and, the power company having failed to provide preventive measures adequate to the occasion, the attempted removal of the wires was followed by actual damage to the deceased and the act of removal was therefore wrongful as causing the wrong done to the deceased. We do not see that it is vitally material whether the deceased was killed by a current that flowed from one direction or the other. It was caused by the operation of defendant's plant by sending an unquestionably dangerous current through the wires which it had ordered the contractor to remove. In other words, it was the act of the power company, and no one can get rid of liability for injury occasioned to another by a wrongful act by seeking to throw the responsibility on an agent whom he has employed to do the act.

In short, the work which the independent contractor was doing, to wit, the removal of the 2300 volt primary wires, was of such a dangerous and hazardous nature that it came within the exceptions stated in section 4415 of the Civil Code (1910). The duty was a non-delegable duty. "The words 'non-delegable duty' do not imply that there are duties which can be discharged by appointing others to perform them. They describe duties the performance of which may properly be delegated to another person, but subject to the condition that liability follows if the person to whom the performance is delegated acts improperly with respect to it. The master's non-delegable duty of care to his servants is expressed in terms of liability [by the statement that he is subject to liability] to his servants if he does not use reasonable care to keep their working conditions reasonably safe, or if those whom he employs for such

purpose, whether or not his servants, do not use such care." Restatement of the Law of Agency (American Law Institute), 1148, § 491.

In my opinion the evidence authorized the verdict.