**Ernest Sterling HODGE, a Minor, by and through his Father, Russell S. Hodge, as next friend, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Russell S. HODGE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 2238, 2371.

United States District Court,
M. D. Georgia,
Macon Division.

Feb. 26, 1969.

Melton, McKenna & House, Macon, Ga., for plaintiff.

Anthony T. Giattina, Department of Justice, Washington, D. C., Floyd M. Buford, U. S. Atty., Macon, Ga., for defendant.

BOOTLE, Chief Judge:

These actions, numbers 2238 and 2371, were brought against the United States under the Federal Tort Claims Act, this court having jurisdiction by virtue of 28 U.S.C. section 1346(b). In accordance with 28 U.S.C. section 2402 the cases were heard by the court without a jury. This opinion is filed to comply with Fed.R.Civ.P. 52(a) and constitutes the court's findings of fact and conclusions of law.

On Monday, August 22, 1966, Ernest Sterling Hodge (hereinafter referred to as Hodge), the plaintiff in number 2238 and son of the plaintiff in number 2371, sustained severe and permanent injuries as a result of his falling approximately 25 feet through the roof of Building 127 on Warner Robins Air Force Base where he was employed by an independent contractor to engage in roofing work. The principal result of these injuries is that he was rendered a quadriplegic with only limited facility in his hands and arms and no feeling or voluntary muscular function in any part of his body below the upper portions of his chest. He is receiving workmen's compensation benefits on the basis of his employment by the contractor.

In light of the numerous theories under which the plaintiffs seek to hold the government liable, it is necessary to give a fairly detailed factual recount. During the Summer of 1966, prior to beginning the job on which he sustained the above-described injuries, Hodge, then 18 years of age, and a companion, Andrew Norman (hereinafter referred to as Norman), then 17 years of age, had obtained two construction jobs (neither of which involved working at heights)

through Hodge's personal acquaintance with a neighbor, Mr. Phillips, who worked in the Contracting Office on the Air Force base. Through Phillips, Hodge learned of a contractor who needed workers, and he and his companion secured employment by contacting the contractor. After the expiration of this job they were contacted and hired for a second job by another contractor who had learned of the boys from the contractor who had first hired them. When this employment terminated, Hodge, who had met the Contracting Officer for the base (Mr. Greer) while working on the two above-mentioned construction jobs, asked him if he knew of any other jobs where contractors might need workers. On Thursday, August 18, the two boys went to Mr. Greer's office, and he drove them over to Building 127 where an independent contractor, H. C. Chambless, was engaged in roof construction. After introducing the boys to Chambless, who hired them to begin work on the roof Monday morning, Greer told them that the roof was "weak" (record at 256, 325, 334) and "dangerous" (record at 256, 325, 535) and that they should "be careful" (record at 256, 325, 535). Neither Greer nor Chambless told the boys that they were to work completely from plywood walkways and would not otherwise be safe. However, Greer testified [1] that, in the presence of Hodge and Norman, Chambless told Greer "that he would definitely see that they would have walkboards placed for the employees." (Record at 535).

Chambless had a contract with the Air Force under which he undertook to remove the old roof covering the western half of Building 127 and replace it with new roofing. The section to be replaced was in the shape of a rectangle roughly 100 feet on the east and west sides and 200 feet on the north and south sides.

Building 127 is a large practically flat-roofed structure which was built during World War II, and, as a temporary wartime expedient, and roof was constructed of Gypsum Board [2] decking upon which was applied layers of roofing felt, then tar and gravel. The rafters, 2 inches wide, and from photograph P-7 apparently 8 inches or 10 inches deep, over which the Gypsum Board was applied were 24 inches apart, 26 inches from center to center.

At the time of the Chambless contract the roof of Building 127 was in a deteriorated condition. However, except for some low spots where the Gypsum Board decking had sagged so that the impressions of the rafters could be seen on the flat roof surface, the roof did not appear to be as weak as it actually was. About midway along the south side of the building was a chute (for the disposal of the pieces of old roof) which was built on that side by the contractor at the request of the government so that debris would not be thrown off the north side of the building and damage jet aircraft by being ingested into the engines.

Building 127 houses the Air Freight Terminal where air freight is unloaded by the ground crew and is sorted by means of an extensive system of steel conveyors running throughout the building. With respect to occupancy of the building during the contract period, the contract provided:

"*Continued Occupancy:* * * * Facilities will not be vacated by the Air Force and the contractor will be required to accomplish his work with a minimum of interference to the occupants and full protection for the occupants and the equipment in and around the building. All work con-

---

1. Chambless did not testify since he was killed as a result of falling from Building 127 in a manner not related to this case.

2. Gypsum Board is a well-known material similar to but stronger than sheetrock and is composed of a gypsum composition impregnated with some type of fiber and covered on the back and front with a layer of heavy paper. Two half-inch layers of this material are then cemented together to form one solid board.

nected with this contract will be accomplished during the hours of 8:00 a. m. and 4:45 p. m., Monday through Friday. Written approval will be required for other hours of work. Ground work areas will be adequate and will be where recommended by the Contracting Officer."

With respect to accident prevention, General Provision Number 46 of the Chambless contract provided:

"In order to provide safety controls for protection to the life and health of employees and other persons, for prevention of damage to property, materials, supplies and equipment; and for avoidance of work interruptions in the performance of this contract, the Contractor shall comply with all pertinent provisions of the Corps of Engineers Manual, EM 385–1–1, dated 13 March 1958, entitled 'General Safety Requirements,' as amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose."

The provisions of the Corps of Engineers Manual specified in the contract which may be pertinent provide as follows:

"7–i. *Employees* working from unguarded surfaces above pits or moving machinery, over dangerous waters or boiling cauldrons, on steep slopes, or otherwise *subjected to falls hazardous to life and limb, shall be secured by safety belts and life lines* or protected by use of safety nets."[3] (Emphasis added.)

"20–21 Runways, ramps, platforms, elevated work surfaces, and scaffolds of 6 feet in height or more above the adjoining surface shall be effectively guarded as follows:

"a. Guard rails of such height and stability as the nature of the work being performed * * * may re-

quire. * * * [I]ntermediate rails shall be provided.

"b. Toeboards not less than 6 inches in height * * * shall be provided as necessary. * * * "

\* \* \* \* \* \*

"F. During construction *all openings*—floor, *roof*, stairwell, shaftways, pits, *and similar unguarded locations shall be provided with an inclosure guard* securely anchored in the opening. * * * *If the use of such a guard is not considered feasible, then the openings shall be decked over solid or closed with material and bracing of sufficient strength to support any load which may be imposed, and properly anchored to prevent accidental displacement.* (Emphasis added.)

"20–22 In the construction of roofs, protective devices shall be provided which will prevent workmen from slipping and falling from the roof, and prevent workmen on lower levels from being struck by falling objects. These devices may be shingling footlocks, lifelines, crawling boards, ladders, railings, catwalks, toeboards, *temporary decking, or any other device that will furnish positive protection.*" (Emphasis added.)

At a preconstruction conference, which the contract requires the contractor to attend, Chambless was advised of the requirements of the safety manual and was given a copy of the manual. It was specifically "recommended" to him by Safety Officer Edward C. Holt that he use plywood walkboards or other "suitable planking" to prevent workmen from stepping onto unprotected areas and falling through the roof. (Record at 56, 74). Also discussed at the conference was the method to be used to prevent government employees in the building from working beneath an area of the roof then being demolished or reroofed. The contractor was supposed to (and did) effect coordination with the

---

3. An amendment to this section, which was not furnished to the contractor, is mentioned at a later point in this opinion where it is held not to be helpful to a resolution of the issues involved in this case.

workers below by designating the area over which he would be working on a particular day. Upon receiving this designation the officer in charge of operations in the building would see that the area was roped off. The roped-off areas were fairly large and in practice remained roped off for a day or two while work was being done on the roof above.

Early on Monday morning, August 22, 1966, Hodge and Norman went together to the job site on the base. Later, when Chambless arrived, he instructed them that their specific duties were to pick up the pieces of old roofing material that other workers were removing, load the material into wheelbarrows and take it over to the south side of the roof where they were to dump it down the chute leading into a truck. When the two boys began working (about 9:00 a. m.), there were no plywood walkways except for a few pieces covering a hole in the roof in front of the chute on the south side about which Chambless had warned them. (Record at 176). All workers on the roof were then standing on the bare roof surface which had previously been stripped of the layer of tar and gravel leaving only Gypsum Board covered by roofing felt or tar paper. The other workers had begun tearing off the old roof in the northeast corner of the rectangular section of the roof, so that is where Hodge and Norman began loading the wheelbarrows. Chambless did not remain at the site and there were no government employees on the roof at this time. A government employee later visited the site briefly to determine whether or not the technical requirements of the contract (type and amount of materials, etc.) were being complied with.

At about 11:00 a. m., after the boys had made several trips carrying loads of the old roofing material over the bare roof surface between the work area in the northeast corner and the chute on the south side, the roof gave way under Norman about midway along this route, but he managed to catch himself with his elbows on the rafters until Hodge came over and pulled him back up onto the roof. Also, at some time before 12:00 noon, either prior to or after Norman's fall, Hodge's foot went through the roof at a point near the chute on the south side. To combat the danger, which by the time of Norman's near fall had became clearly apparent, the two boys made a walkway from a point near the work area to the chute using several pieces of 4 by 8 foot plywood which they found on a canopy extending out from the building on a level several feet lower than the level of the roof. However, due either to a lack of a sufficient supply of this plywood (Norman says there was not enough, Record 180; Hodge says there was, Record 268) or to some other reason such as the apparent strength of the roof, no plywood was placed over that portion of the roof around the perimeter of the small northeast section of the roof then being torn up. It is in this area that the boys were standing around picking up pieces of roofing material thrown aside by the workers tearing off the old roof. At about 1:15 p. m., Hodge was standing in this unprotected area waiting to pick up more roofing material when the roof beneath him gave way causing him to fall and sustain the injuries complained of.

Ernest Hodge, suing in Number 2238 by his father as next friend, asks damages of $1,000,000 for bodily injuries, pain and suffering, etc. His father, Russell Hodge, in Number 2371 asks damages of $20,000 for medical expenses and loss of services.

The plaintiffs' numerous theories and contentions can be gleaned from the complaint and the pre-trial order and are here summarized. The plaintiffs contend that the government was negligent in the following particulars (quoting from the complaint in Number 2238):

1. "In failing to furnish a safe place to work to plaintiff, an invitee on said premises;

2. "In failing to warn plaintiff of the dangerous, hazardous and unsafe condition of said roof which was known to defendant but which was not apparent to employees of said contractor, including plaintiff;

3. "In permitting plaintiff to work on said roof without requiring adequate safety precautions by the Contractor, despite defendant's actual knowledge of the dangerous, hazardous and unsafe condition thereof;

4. "In failing to include in its contract with plaintiff's employer specific safety requirements to protect employees of said contractor, including plaintiff, in working on said roof, in view of defendant's actual knowledge of the dangerous hazardous and unsafe condition of said roof;

5. "In failing to continually survey the operations of the contractor in the work required of contractor to make certain that all reasonably required safety precautions with reference to employees of said contractor, including plaintiff, going on said roof were complied with."

Plaintiffs further contend (quoting from the Pre-trial Order and omitting those contentions which add nothing to the contentions set forth above):

6. "That the Government by its continued occupancy of the building in question and its direction of the manner and time and place of the work interfered with the work of the contractor in such a manner that adequate safeguards were impossible if the work were to be carried on in the manner prescribed by the Government.

7. "That the Government by virtue of its continued occupancy of the premises is liable for the negligence of the contractor in failing to establish, implement and require adequate safeguards for the protection of employees.

8. "That the Government by directing and supervising the performance of the contract is responsible as a matter of law for the negligence of its agents and its independent contractor.

9. "That the Government by virtue of its knowledge of the intrinsically dangerous nature of the work continued to owe to plaintiff, as invitee on its premises, the statutory duty of a landowner or occupier under the Georgia law; that is to say, to provide him a safe place in which to work.

10. [Similar to 5 above] "That the Government was negligent after assuming responsibility for safety on the job in failing to continually survey the contractor's operations to insure compliance with safety requirements.

11. "That the Government was negligent in hiring a contractor for performance of work which by its very nature and to the knowledge of the Government was intrinsically dangerous, who was inexperienced in such work and incompetent to perform the work required of him.

12. "That the Government was negligent in permitting said inexperienced contractor in the work required to perform said work with workmen who had no experience in such work.

13. [Similar to 4 above] "That the Government by virtue of its superior knowledge of the premises, the intrinsically dangerous nature of the work, and of safety requirements was negligent in letting the contract without requiring as a part thereof safety precautions known to the Government which would have avoided the injury including, but not limited to, the use of safety nets, safety lines, safety belts, scaffolding and staging.

14. "The Government was further negligent in the de facto employment of plaintiff, that is, the direct arrangements made by the contracting officer who took the plaintiff to the building in question and arranged for his employment by the contractor, these steps being taken with full knowledge of the hazardous nature of the work to be performed and with

full knowledge of the youth and total inexperience of the plaintiff.

15. "The Government was negligent in its direction of the work and the safety precautions of the people working on the roof of said building."

In contention numbers 1 and 2, the plaintiffs seek to hold the government liable for breaching its obligation as a landowner set forth as follows in Ga. Code Ann. section 105–401:

"Where the owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries occasioned by his failure to exercise ordinary care in keeping the premises and approaches safe."

■ This court finds and holds that this statute does not apply to the government under the facts of this case since the government was not in possession and control of the portion of the roof subject to the contract, and that, even if the statute were applicable, the government used reasonable care to keep its premises safe by giving the contractor warning of the condition of the roof and advising him of the recommended precautions, and that, in any event, Hodge was warned of the dangerous condition of the roof, by Mr. Greer, the Contracting Officer for the base, and by the happenings on the roof on the day of his fall.[4]

■ Under Georgia law, a landowner or one in possession of land is relieved of the duties of a landowner to those who come onto the premises when possession and control of the land is surrendered to an independent contractor. Butler v. Lewman, 115 Ga. 752, 756, 42 S.E. 98 (1902); Central of Georgia Ry. v. Lawley, 33 Ga.App. 375(4), 126 S.E. 273 (1924); Newburn v. Healey Real Estate and Improvement Company, 17 Ga.App. 217(1), 86 S.E. 429 (1915); Johnson v. Western & Atlantic R. R., 4 Ga.App. 131, 134–135, 60 S.E. 1023 (1908). See also, Scott Paper Company v. Cooper, 403 F.2d 526 (5th Cir. 1968). (Alabama law). The contractor then becomes the "occupier" of the land within the meaning of the Georgia statute. Tyler v. Peel Corporation, 371 F.2d 788, 790 (5th Cir. 1967). If such possession and control were still in the landowner, it would be no defense to him that the defective condition causing the injury was created by independent contractor if the landowner, by the exercise of ordinary care could have discovered the defect. Hickman v. Toole, 35 Ga.App. 697, 134 S.E. 635 (1926).

■ Possession may be defined as having personal charge of or exercising the rights of management or control over the property in question. Custody and control are the commonly accepted and generally understood incidents of possession. This court is convinced and finds that the contractor was in possession of that portion of the roof which was the subject of the contract. Georgia law recognizes that a landowner can relinquish control over a portion of his premises and is thereafter relieved of the duties of section 105–401. See Callaham v. Carlson, 85 Ga.App. 4, 16–17, 67 S.E.2d 726 (1951); McDade v. West,

4. In view of this holding it is not deemed necessary to pass on the additional contention of the government that *by the mere fact of his employment to fix the roof* Hodge assumed the risks involved in repairing the "very defect" that occasioned his injuries. *See* Dartmouth Spinning Company v. Achord, 84 Ga. 14, 16–17, 10 S.E. 449 (1889); Fulton Ice and Coal Company v. Pece, 29 Ga.App. 507, 519–520, 116 S.E. 57 (1922); Huey v. City of Atlanta, 8 Ga.App. 597, 604, 70 S.E. 71 (1911); Lucas v. Southern Ry.,

1 Ga.App. 810, 812–813, 57 S.E. 1041 (1907); Green v. Babcock Brothers Lumber Company, 130 Ga. 469, 60 S.E. 1062 (1908). However, as will be seen at a later point in this opinion this court does find occasion for application of the assumption of risk doctrine due to the knowledge that came to Hodge of the latent dangers involved in fixing this particular roof after he had been warned both verbally and by the events of the day of his fall.

80 Ga.App. 481, 487, 56 S.E.2d 299 (1949); Huey v. City of Atlanta, 8 Ga. App. 597, 603, 70 S.E. 71 (1910). One of the most persuasive factors indicating that the contractor had possession and control over the portion of the roof under repair is that he was engaged in the process of completely demolishing it (except for the rafters which he replaced only if defective) and replacing it with a new roof. Government inspectors came onto the roof for short periods and then only for the purpose of seeing that the work was being done in accordance with contract specifications. When the work is the complete demolition and replacement of a structure such as a roof, the question of who had control over the work is relevant, although not conclusive, in determining who had possession and control of the premises (the roof). Furthermore, to hold that the government was in possession and control and was thus responsible for the safety conditions on the premises would produce an impractical result. This is so because the evidence makes it appear very probable that prior to the time that the contractor's other workers had removed the top layer consisting of tar and gravel, (before Hodge was hired) the roof would and did support human weight. It does not appear that any of these workers fell through the roof although they were walking all over it scraping off the tar and gravel. It is thus logical to infer that the strength of the old roof was a safety condition which was changing with the progress of the contractor's work. With this practical aspect of the case in mind it is clear that, as between the contractor and the Air Force, the contractor was in the best position to know of the strength of the remaining layers of roof. This feature is of course not decisive. However, all of the factors heretofore mentioned and all of the surrounding circumstances of this case compel this court to reach the conclusion that the contractor was in possession and control of the section of the roof being repaired.

In opposition, the plaintiffs point out that under the contract (1) the Air Force was to continue occupancy of the building; (2) the contractor was restricted in the hours during which he could conduct operations (8:00 a. m. to 4:45 p. m.), and (3) he had to accomplish his work "with a minimum of interference to the occupants" below. As to the continuance of operations in the building by the Air Force, the short answer is that, as pointed out above, Georgia law recognizes that a contractor can be in possession and control of a portion of the landowner's premises, and the Air Force was conducting no operations on the roof. As to the limit on working hours, although the contractor could work only from 8:00 a. m. to 4:45 p. m., this amounted to a full work day, and Air Force personnel did not perform any work on the roof during the contractor's absence (or any other time). The limit in working hours is thus of no significance.

The contractor's obligation to accomplish his work with a minimum of interference to the ground personnel is a more important feature of the case than the two points discussed above and deserves more attention. The Air Force understandably did not want its personnel working beneath portions of the roof then under repairs since there was danger of their being struck by falling debris. The evidence shows, however, that in practice the contractor had control over where he would be working on a given day. All that he had to do was to notify those working below to rope off the area beneath the section of roof upon which he intended to work. If by chance there was freight in that area, it would take the ground crew a very short time to move it. No conflicts of this nature ever arose on this job. In addition, once an area was roped off, it would remain that way for at least a day. Moreover, the contractor had a 60-day time limit in which to complete the roofing project, and by the very nature of this operation he could not be expected to skip portions of the old roof under

which operations were being conducted and come back later to repair such portions. The practical aspects of this job therefore indicate that, had a conflict arisen, the contractor would have prevailed (except perhaps if there were an emergency necessitating a maximum flow of wartime materials). This court's findings as to possession and control must therefore stand.

■■■■ Even if it is assumed that the duties of a landowner still were upon the government and that it had actual knowledge of the hidden dangerous defect, the government's duty to use reasonable care to make the premises safe for invitees was discharged under the circumstances of this case by giving a clear warning to the contractor (as proposed to his individual employees) both of the condition of the roof and of the recommended method of assuring safety to the workers thereon (the use of plywood walkways). Whitlow v. Seaboard Air Line R. R., 222 F.2d 57 (4th Cir. 1955) (applying Georgia law). *See also* Gulf Oil Corporation v. Bivins, 276 F.2d 753 (5th Cir. 1960) (Texas law). As a further stumbling block to the plaintiffs' ability to recover for breach of the statutory obligations of landowner, it is clear that from his experiences on the day of the accident (witnessing Norman's fall, pushing his own foot through the roof, and handling broken up pieces of Gypsum Board decking) Hodge had as much actual knowledge of the danger as a reasonable warning could have given. Moreover, he was given an actual warning by Mr. Greer, the Contracting Officer for the base, who testified: "I told them [Hodge, Norman and other boys] it was deemed to be a dangerous

job * * * and the contractor was required to place walk boards and they would have to be careful. * * * Mr. Chambless told us in front of the boys the he would definitely see that they would have walk boards placed for the employees." (Record at 535). He therefore cannot complain of any lack of warning by the government even if the government were under a duty to give him a *personal* warning.[5]

"'The rules governing the land proprietor's duty to his invitee presuppose that the possessor knows of the condition and "has no reason to believe that they (his invitees) will discover the condition or realize the risk involved therein." 2 Restatement, Law of Torts, Sec. 343. The basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does and then by voluntarily acting, in view of his knowledge, assumes the risks and dangers incident to the known condition.'" Hunt v. Thomasville Baseball Company, 80 Ga.App. 572, 573, 56 S.E.2d 828, 829 (1949) (quoting from Hudson v. Kansas City Baseball Club, 349 Mo. 1215, 164 S.W. 2d 318). *Accord*, Rogers v. Atlanta Enterprises, Inc., 89 Ga.App. 903, 906, 81 S.E.2d 721 (1954).

■■■■ Contentions numbers 3, 4 and 13 all express the idea contained in section 413 of the Restatement of Torts, Second, that where a contractee engages a contractor to perform work which the contractee should realize is likely to cre-

---

5. It should be pointed out that if the government were in possession of the roof, a warning is all that reasonable care would have required of it under the particular circumstances of this case. This is true because the contractor was to supply all materials necessary for the work, and this is a circumstance which the government as a reasonable landowner would be entitled to take into consideration in deciding whether to warn or to install devices to make the premises safe. Especially is this so where, as here, the landowner had no reason to suspect that the contractor would not take the necessary measures to guard against the danger of which he had been warned. This would not amount to a delegation of the government's duty but would merely be the choosing of one method of *personally* discharging the duty over another method.

ate an unreasonable risk of danger to others unless special precautions are taken, such contractee is liable for harm caused by the absence of such precautions if he "(a) fails to provide in the contract that the contractor shall take such precautions, or (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions." That this section states the law in Georgia is asserted by the plaintiffs to be shown by some dicta in Georgia Power Company v. Gillespie, 49 Ga.App. 788, 793–794, 176 S.E. 786 (1934). However, other language in that case indicates that the facts of the instant case would not entitle the plaintiffs to prevail for the lack of safety precautions in the contract for the reason that the failure to use the plywood would be considered as "collateral negligence" of the contractor. *See* Prosser, Handbook of the Law of Torts 487–88 (3d Ed. 1964). In Gillespie, the court at page 794, 176 S.E. at p. 789 gives the Georgia version of the doctrine of "collateral negligence" in these terms:

> " 'Where the injury results directly from the acts which the contractor agrees to and is authorized to do, the person who employs the contractor is equally liable to the injured party.' Robbins v. Chicago, 4 Wall. (U.S.) 657, 18 L.Ed. 427. If the act or neglect which produces the injury "is purely collateral to the work contracted to be done, and entirely the result of the wrongful acts of the contractor and his workmen, the rule is that the employer is not liable.' Palmer v. City of Lincoln, 5 Neb. 136, 25 Am. Rep. 470. *In the construction of a tall office building the owner would not be liable for the failure of the independent contractor to erect safe scaffold-*

*ing in the construction of such building, although both he and the independent contractor knew that the failure to do so was necessarily dangerous to the employees working thereon.* In 39 C.J. 1327, it is said: *'The employer has a right to rely on the presumption that the contractor will discharge his legal duties owing to his employees and third persons.'* " (Emphasis added.)

As Prosser suggests, what this doctrine really seems to be saying is that the *contractee* has not been negligent in not contracting for the taking of the precautions because the peculiar risk is not necessarily involved in the work to be done but instead arises from the abnormal departure from usual or contemplated methods by the servants of the contractor. In the present case it can logically be said and this court finds and holds that the danger arose from the failure of the contractor's employees to use the customary and contemplated walkboards (insofar as the contractee is concerned it does not matter that their failure to do so was the fault of the contractor). However, assuming arguendo the applicability of the principle of Restatement Section 413 to this case the plaintiffs can derive no benefit therefrom because it is abundantly clear that adequate safety precautions were provided for both in the contract and by the specific recommendation made to the contractor at the pre-construction conference that he provide plywood walkways for the use of the workers. The plaintiffs have not convinced this court and this court cannot find that reasonable safety practices required the use of safety nets and that the work would not have been made reasonably safe (not accident proof) by the proper use of such walkways.[6] The evidence does not show

---

6. In an effort to show that the government should have included in the contract a provision requiring the use of safety nets by the contractor, the plaintiffs introduced into evidence a Corps of Engineers regulation amending the safety manual (which was made a part of the contract). It is sufficient to say of this regulation that its applicability to this case would depend on a determination of whether or not the roofing operation could be accomplished from adequately guarded staging, scaffolds or platforms. Since this court has found and held that the operation could be performed by the use of walkways, this regulation does not help the plaintiffs' case.

that safety nets are commonly used for such operations in the construction industry. Furthermore, even if a worker, in order to utilize plywood walkways for safety purposes, would have to step off the plywood momentarily in order to move it as the roof demolition progresses, this would not mean that he cannot do this in a reasonably safe manner.

 Contention number 5 embodies the principle of Section 414 of the Restatement of Torts, Second, which provides for liability of the contractee for failure to use reasonable care in the exercise of control which the contractee has retained over the work. Without deciding whether this theory of liability is recognized under Georgia law, (see discussion of contention number 6 infra) this court finds that the plaintiffs have not carried the burden of showing that the government was negligent in its surveillance of the job or in its failure to exercise its power under the contract to stop work on the project. Contention number 10 is the same as contention number 5 except that, in addition to the negligent supervision and surveillance asserted in 5, there is added the assertion that the government assumed responsibility for the safety of the contractor's employees. The defect in this contention (besides those covered in the discussion of contention number 5 above) is that both by the provisions of the contract and by the general understanding of the parties, the contractor was to be responsible for the safety of his employees. The government never assumed such responsibility. *See* Roberson v. United States, 382 F.2d 714, 721–722 (9th Cir. 1962) holding that safety inspection activities on the part of the government as contractee which do not result in affirmative acts of negligence and are intended to make sure that the contractor fulfills his obligations under the contract do not create a duty on the part of the government to employees of such independent contractor. *See also* Beason v. United States, 396 F.2d 2 (5th Cir. 1968).

 Contentions numbers 6 through 9 merit a more extensive treatment than do some of those discussed above. Number 6 is based on the statutory authority of section 105–502(5), which provides for liability of the employer of an independent contractor for the negligence of the contractor (and apparently for his own negligence also) "[i]f the employer * * * interferes and assumes control * * * so that an injury results which is traceable to his interference." The terms of the statute require both interference with and assumption of control of some aspect of the operation to which the injury is traceable. The interference and assumption of control need not be of a degree great enough to create the relation of master and servant so long as the injury is traceable to the interference. International Agricultural Corporation v. Suber, 24 Ga.App. 445, 101 S.E. 300 (1919). The acts of interference and assumption of control upon which the plaintiffs rely are the continued occupancy of the building by the Air Force and the Air Force's direction of the manner, time and place of the work. There is no merit in this contention. It does not appear that the Air Force ever assumed control of any aspect of the contractor's operations. Furthermore, there has not been established a sufficient causal relationship between Hodge's fall and any acts of "interference" on the part of the Air Force. The acts of "interference" which the plaintiffs have in mind are the requirements that the contractor remove the roof while the building was still occupied and that he place the chute for old roofing material on the south side of the building. As to both requirements it has not been shown that they prevented the contractor from employing any technique which would have prevented Hodge's injury. From all of the evidence, it seems highly improbable that, had operations been halted in the building, the contractor would have used a safety net. Such a net was a relatively new safety innovation. It is doubtful that, had the gov-

ernment employees not been working in the building, the contractor would have adopted the plan of throwing debris from the old roof directly down into the building so as to avoid the necessity of hiring workers like Hodge and Norman to walk around picking up such debris. This practice would probably have necessitated the removal of a large amount of heavy fixtures and equipment due to the danger of damage from falling chunks of this material. At the very least, it would have been necessary to construct substantial guards to protect the government property below. Furthermore, the location of the chute had nothing to do with the fall. Hodge was not going to or returning from the chute when he fell, and for all that appears from the evidence, he would have been standing in the same vicinity at the time of his fall had the chute been located elsewhere.

The most serious defect in the "interference" theory is that the cause of Hodge's injury was not the occupancy of the premises below. Instead, the injury is traceable to an improper manner of doing the work. Had the contractor used plywood walkways, the method recommended to him by the government's safety officer and suggested by the safety manual,[7] the job could have been done with reasonable safety. On proximate cause, see Edmondson v. Town of Morven, 41 Ga.App. 209(3) (4), 152 S.E. 280 (1930).

■ Contention number 7, that because of Air Force occupancy of the building the government is liable for the negligent failure of the contractor to provide safety measures for his employees, does not state any recognized theory of liability unless it is construed as claiming that the contractor's negligence resulted in a breach by the government of its duty as landowner to use reasonable care to keep the premises safe for invitees. This theory is defeated by the finding set forth above, that the government owed no duty as owner of Building 127 to Hodge since the Air Force had relinquished possession and control of the portion of the roof under repair to the contractor.

Contention number 8 apparently is based upon claims of acts of negligence on the part of Air Force personnel in directing and supervising the work and on the theory contained in Ga.Code Ann. section 105–502(5) that by assuming control over the operation to an extent ordinarily done by a master over his own servants, the contractee in effect becomes the master and assumes the responsibility of one in that position. The contractor would then become the servant of the contractee so that the contractee would be liable for the contractor's negligent supervision under the doctrine of *respondeat superior*. The theory based on the assumption of control by the Air Force is the only point which merits mention in view of the findings and holdings elsewhere in this opinion finding no negligence on the part of the Air Force. The plaintiffs may not recover under this theory since the evidence clearly shows that the small amount of supervision done by Air Force personnel was only for the purpose of seeing that the work was done in accordance with the contract and is therefore not sufficient under Georgia law to create the relationship of master and servant. Louisville & Nashville R. R. v. Hughes, 134 Ga. 75(5), 67 S.E. 542 (1909); Harrison v. Kiser, 79 Ga. 588(7), 4 S.E. 320 (1887); Malin v. City Council of Augusta, 29 Ga.App. 393(2), 115 S.E. 504 (1922); Quinan v. Standard Fuel Supply Company, 25 Ga. App. 47(1), 102 S.E. 543 (1920). That the government did not have the right to supervise the manner in which the work was being done is evidenced by the fact that even with respect to the contract provision on accident prevention, the

7. The section of the safety manual (EM 385–1–1) that most clearly authorizes the use of plywood walkways is section 20– 21(f) which is quoted in an earlier portion of this opinion.

procedure for correcting the contractor's refusal to carry out his agreement to comply with the safety provisions of the Corps of Engineers Manual was that the Contracting Officer would, after notice and an opportunity to comply had been given to the contractor, order that the work be stopped. This falls far short of showing the existence of a right in the government to go on the job site and give instructions to the contractor's employees regarding the manner of performing their work.

In another effort to hold the government liable for the negligence of the independent contractor notwithstanding that he was in possession and control of the premises, the plaintiffs, in contention number 9, assert that this work was intrinsically or inherently dangerous and that the government should not be allowed to delegate its duty as landowner to the independent contractor. The basis for this contention is Ga.Code Ann. section 105–502(2) which provides for liability of an employer for the negligence of an independent contractor "If, according to previous knowledge and experience, the work to be done is in its nature dangerous to others, however carefully performed." In construing this section, Georgia courts have held that work is not "dangerous to others however carefully performed" if the danger results from doing the work in an unsafe manner and there is a safe way of doing the work. Robbins Home Improvement Company v. Guthrie, 213 Ga. 138, 140, 97 S.E.2d 153 (1957); Georgia Power Company v. Gillespie, 49 Ga.App. 788, 794–795, 176 S.E. 786 (1934). In light of the finding of this court that there was a safe way of performing the job of removing the roofing debris and that the danger resulted from an unsafe manner of performing the job, the plaintiffs cannot bring their case within this Code Section. As to the kinds of activities which come within the inherently dangerous exception under Georgia law, see Community Gas Company v. Williams, 87 Ga.App. 68, 78–80, 73 S.E.2d 119 (1952); Georgia Power Company v. Gillespie, *supra*.

In addition to the reason set forth above, there are two other reasons for holding that the government is not liable for its contractor's negligence in rendering the government's premises unsafe. First, the United States cannot be held liable under the Tort Claims Act for the negligence of an independent contractor. The Act requires that the act of negligence be that of a government *employee*. Strangi v. United States, 211 F.2d 305 (5th Cir. 1954). *See also,* Dushon v. United States 243 F.2d 451, 454, 17 Alaska 245 (9th Cir. 1957). Since Chambless was an independent contractor, the United States cannot under any circumstances be held liable under the Tort Claims Act for his negligence.

Closely related (in its application to this case) to the rule against imposing liability under the Act for the negligence of an independent contractor is the rule that the Tort Claims Act does not authorize any suit based on a theory of absolute or strict liability. Dalehite v. United States, 346 U.S. 15, 44, 73 S. Ct. 956, 97 L.Ed. 1427, 1445 (1953). Although the theory of section 105–502(2) is more properly classified as a case of "vicarious" rather than "strict" or "absolute" liability, see Prosser, Handbook of the Law of Torts 483 (3d Ed. 1964), it may be that the imposition of vicarious liability due to the nature of the activity in which the contractor was engaged is within the holding of the *Dalehite* case since the United States under Ga.Code Ann. Sec. 105–502(2) would be held liable regardless of the absence of negligence on the part of any of its servants. However, because of the obvious overlapping[8] of the *Dalehite* rule

---

8. This overlapping is most easily seen by comparing the following statements: Under the rule against imposing liability under the Act on the United States for the negligence of an independent contractor, the United States could not be held liable in this case because the negligence was not committed by a government employee;

as applied to this case with the rule against holding the United States liable for the negligence of an independent contractor, this court does not express any opinion as to whether the *Dalehite* rule is broad enough to encompass the Georgia doctrine of section 105–502(2) imposing liability on the employer of an independent contractor for the negligence of such contractor if the work to be done is inherently dangerous.

█ With respect to the plaintiffs' assertion (contention number 11) that the government was negligent in hiring an incompetent contractor, without deciding whether the selection of such a contractor, was an exercise of discretion which by virtue of 28 U.S.C. section 2680(a) is not covered by the Tort Claims Act[9] this court finds that the evidence clearly fails to establish either the contractor's incompetency or any lack of due care on the part of the contracting officer in selecting the contractor. The evidence as to Chambless' experience shows that, while there is no indication that he had ever performed work on Gypsum Board roofs (which are rare) he had performed at least three construction contracts on Robins Air Force Base prior to this contract (Record at 550), that, shortly before beginning the present contract he was engaged in roofing 18 barracks in Savannah, Georgia, and that on all contracts performed by him at Robins Air Force Base prior to this contract he had performed satisfactorily and had had no in-

juries among his employees on the job. (Record at 546). The only evidence of incompetency is testimony to the effect that Chambless was negligent in his supervision of the work *on this contract* and that he had no formal safety program. This showing is insufficient to establish incompetency. The record does not support the conclusion that the government failed to exercise due care in the selection of Chambless for the contract.

█ The most that need be said in answer to contention number 12, that the government was negligent in permitting the contractor to use inexperienced employees, is that this court knows of no theory that would impose on the contractee the duty to the contractor's employees of seeing to it that the contractor employs only those workers with experience. Especially is this so where, as here, experience was not necessary to the safety of a properly warned employee, and the contractee had relinquished possession and control over his premises to the contractor.[10]

██ Since the plaintiffs have not shown that the government was guilty of negligence in connection with any directing of the work or the safety precautions to be used by the employees of the contractor, the plaintiffs cannot prevail under contention number 15. Likewise, with respect to contention number 14, this court finds no negligence in the part that the Air Force played in

---

under the *Dalehite* rule the United States would escape liability because there has been no negligence on the part of the government. In other cases the rules would be entirely separate since one deals with parties and the other deals with the absence of blameworthy conduct.

9. *See* Dalehite v. United States, 346 U.S. 15, 35–36, 73 S.Ct. 956, 97 L.Ed. 1440–1441 (1953); Lipka v. United States, 249 F.Supp. 213, aff'd. 369 F.2d 288 (2d Cir. 1966). In the case *sub judice* the government made a motion to strike the allegations of the complaint which claimed

that the government is liable for the employment of an incompetent contractor, said motion being made on the ground that the selection of Chambless was a discretionary function within the meaning of the Act as construed by the *Dalehite* and *Lipka* cases. Since this court is denying recovery on this theory for reasons stated below, it is not necessary to rule on the government's motion.

10. There is no indication that Hodge's injuries were caused by the lack of experience on the part of any employee other than himself.

Hodge's being hired by the contractor.[11] The job would not have been unreasonably dangerous even to an inexperienced worker had he been properly warned by the contractor. A contractee " 'has a right to rely on the presumption that the contractor will discharge his legal duties owing to his employees' " Georgia Power Company v. Gillespie, 49 Ga.App. 788, 794, 176 S.E. 786 (1934), among which is the obligation of an employer under Ga.Code Ann. section 66–301 to warn employees of dangers in the employment unknown to the employee of which the employer knows or should know.

■ Were we wrong in our finding and conclusion that the defendant breached no duty it owed to Hodge and hence was guilty of no negligence, we find further that any negligence possibly attributable to the defendant would be much less than the negligence of Hodge who was negligent in continuing to walk and stand upon this weak roof without using plywood boards for support and without making sure that he was standing directly upon the rafters after he had been properly warned by Greer that the roof was weak and that the work was dangerous, and that he would have to be careful, and after he had poked his foot through this roof and after he had seen Norman fall through it. Hodge testified that they did not use all the plywood that was available (Record 339); that they had enough to go all the way from the chute back to where they were working (Record 340); that they did lay it to within about five feet of the area being torn up (Record 343); that immediately prior to his fall the wheelbarrow was right next to him and the plywood walkway was "a couple of feet" over to his side (Record 345–46); that he doesn't remember whether he took a step or whether he was just

standing there and suddenly it gave way (Record 346); that by that time after Norman had fallen and another fellow had fallen he was well aware of the danger of that roof (Record 348), and that he must have thought he was on a beam (Record 347). Thus no justification appears for his standing on the roof, by that time known to him to be weak and dangerous, rather than standing on the plywood walkway which was only a couple of feet over to his side. Since Hodge's negligence exceeded any negligence possibly chargeable to the defendant, Hodge cannot recover. Georgia Railway & Power Co. v. Belote, 20 Ga. App. 454, 93 S.E. 62 (1917). Then too, if we assume arguendo that the defendant was guilty of any negligence in failing to warn Hodge of the weakness or deceptive character of the roof we find that after Hodge learned of such negligence he could by the exercise of ordinary care have avoided the consequences thereof and for this reason he is barred from recovering. Ga.Code Ann. 105–603.

Accordingly, this court finds for the defendant in both cases and it is adjudged and decreed that judgment be entered in accordance with the findings and with this opinion in favor of the defendant, the United States, and against the plaintiffs, Ernest Sterling Hodge and Russell S. Hodge.

In conclusion, this court would like to express its sincere and deep sympathy for Ernest Hodge and for his parents. Only the hardest heart conceivable would not be steeped in admiration of the splendid characteristics possessed by this fine young man. It must be remembered, however, that hard cases cannot be allowed to make bad law, and that this court, in the performance of its duty, cannot declare to be the law, that which is not.

11. It is clear that the Air Force did not become Hodge's employer by virtue of the actions of the Contracting Officer in bringing him as a personal favor to the job site to meet the contractor.